**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

ITT EDUCATIONAL SERVICES, INC.                                           PLAINTIFF

v.                                   No. 4:16CV00055 JLH

AP CONSOLIDATED THEATRES II
LIMITED PARTNERSHIP                                                      DEFENDANT

**OPINION AND ORDER**

This case concerns a commercial lease.  The central issue is whether a letter agreement to renew the lease but for less space than during the original term, subject to the execution of a formal lease amendment, is enforceable when no formal lease agreement was ever executed.

The parties are ITT Educational Services, Inc., and AP Consolidated Theatres II Limited Partnership.  They entered into a lease in October of 2010 for ITT to rent an entire building owned by AP.  The lease term ended May 31, 2016.  In early 2015 the parties began negotiating for the renewal of the lease, but ITT wanted to renew for only part of the building.  In September of 2015, ITT wrote a letter proposing to renew the lease for five years for approximately half of the building.  That proposal stated several terms of the renewal but also that it was subject to "a mutually agreeable lease amendment."  AP accepted the proposal.  While the parties were exchanging drafts of a lease amendment, AP entered into a lease with Little Scholars of Arkansas Foundation, d/b/a LISA Academy, for the entire building and informed ITT it would be required to vacate the building by May 31, 2016.

On February 2, 2016, ITT commenced this action against AP seeking a declaratory judgment, injunctive relief and specific performance.  ITT alleged one claim for breach of contract and one for promissory estoppel.  In an amended complaint, Count I sought a declaratory judgment that AP breached an agreement to execute an amendment to the lease agreement; Count II alleged that the

letter agreement formed a contract that AP breached by entering into an agreement to lease the building to LISA Academy and sought injunctive relief with an alternative request for damages; Count III alleged a claim for promissory estoppel; Count IV alleged that AP breached an agreement to negotiate in good faith; and Count V alleged that AP breached the original lease by showing the property to representatives of LISA Academy without giving ITT notice of the intrusion.   On February 24, this Court granted a motion to expedite the proceedings and scheduled an evidentiary hearing for March 21, 2016, to address whether ITT was entitled to specific performance, an injunction, or other equitable relief.   Before the evidentiary hearing, however, ITT found an alternative space to rent, which rendered its claims for equitable relief moot, so the hearing was cancelled.

AP has now filed a motion for summary judgment arguing that ITT's claims for specific performance, injunctive relief and declaratory relief are moot; the statute of frauds prevents any contract claim based on the letter agreement; the promissory estoppel claim is without merit; Arkansas does not recognize a cause of action for failure to negotiate in good faith; and the breach of contract claim for showing the property is trivial and lacks merit.   ITT has responded under seal to AP's motion for summary judgment and conceded the claims for specific performance, injunctive relief and declaratory relief.[1]

ITT has filed a motion for leave to file a second amended complaint that would remove the claims for specific performance, injunctive and declaratory relief but would add a claim for fraud and seek compensatory and punitive damages.   AP opposes that motion.

---

[1] ITT's claims for specific performance, injunctive relief, and equitable relief are therefore dismissed.

For the following reasons, AP's motion for summary judgment is granted in part and denied in part, and ITT's motion for leave to file a second amended complaint likewise is granted in part and denied in part.

## I. SUMMARY JUDGMENT

### A. THE UNDISPUTED FACTS

ITT and AP entered into a lease agreement in 2010.  Document #15-1.  Pursuant to that lease, ITT rented from AP the 31,796 square foot building located at 12200 Westhaven Drive, Little Rock, Arkansas 72211, along with the 5.8735 acres of land on which it sits.  *Id.* at 6.  The initial lease term was for five years, expiring on May 31, 2016, and included an option to extend for an additional five years.  *Id.* at 7 and 31.

In or around March of 2015, the parties began to negotiate for another five year term.  *See* Document #15-2.  On March 10, 2015, Zachary Lee, ITT's Director of Real Estate, met with Jay Anthony, the President of AP, to view the building and discuss a potential lease renewal.  *Id.* at 10.  Over the course of the next six months, the parties engaged in negotiations via emails and phone calls.  *See* Documents 15-2; 15-3; 15-4; 15-5; 15-7; 15-8; 15-10; 15-11; 15-12; 15-13; 15-20; 15-21; 15-22.  The negotiations were conducted between Lee and Brian Shiu, a Vice President of AP.  Part of the negotiations involved reducing the rented space to half of the space of the building.  Document #15-2 at 8.  The negotiations included a reconfiguration of the space since ITT would occupy only one-half of the building.  On August 13, 2015, Lee sent to Shiu a space plan for ITT to lease 16,173 rentable and 15,073 usable square feet for five years beginning on June 1, 2016.  Document #11-20 at 2; Document #15-6.  On September 9, 2015, Lee sent a letter to Shiu proposing terms for a lease amendment whereby ITT would lease 16,173 rentable and 15,073 usable square feet for another five

years beginning on June 1, 2016, "subject to ITT Executive and Real Estate Committee approvals and to a mutually agreeable Lease Amendment."   Document #15-11 at 1.   This proposal was accepted by AP on the day it was sent, as evidenced by Anthony's signature of that date.   *Id.* at 3. On September 18, 2015, Lee notified Shiu that ITT's executive committee had approved the proposal.   Document #15-13.[2]

The letter agreement identified the property address as 12200 Westhaven Drive and the space requirements as 16,173 rentable and 15,073 usable square feet.   Document #15-11.   In addition to this description of the space requirements, the letter agreement provided for a renewal term of five years; annual rent of $13.25 per square foot in the first year, escalating by a stated amount in each year of the five-year term; improvements to be performed by the tenant with an improvement allowance of $10.00 per rentable square foot; approval by AP of the permit ready plans and specifications; a renewal option; a provision stating who would pay costs associated with the common areas; a provision for signage; a provision stating that AP would not pay any brokerage fees or commissions; and a confidentiality provision.   The letter agreement did not contain an explicit provision regarding outdoor space.   *See id.*   The letter agreement stated that any terms not modified by the letter agreement "shall remain as set forth in the Lease."   *Id.* at 2 ¶ 10.   The letter agreement also stated that "Landlord and Tenant shall execute a mutually acceptable amendment to the Lease."   *Id.* at 2 ¶ 11.

---

[2] Because persons with authority for both ITT and AP accepted the proposal stated in the letter from Lee to Shiu, we will refer to it henceforth as "the letter agreement."   We will refer to the original lease, executed in 2010, as the lease.

On September 18, 2015, Lee informed ITT's real estate broker, Vaughn McQuary, that ITT's deal with AP was completed.  Ex. TT McQuary Dep. 29:5-16.[3]  ITT had been in discussions for the University of Phoenix space at Kirkpatrick Plaza.  Lee Dep. 57:4-13.  McQuary informed two persons that ITT had renewed with their current landlord.  Ex. UU.

On September 28, 2015, Lee submitted ITT's draft of the formal lease amendment to Shiu. Ex. VV.  On October 9 Shiu returned a redlined and edited version of the Proposal.  Ex. WW.  On October 23 Lee responded with edits.  Ex. XX.  In October of 2015, the parties began discussions regarding damage to the exterior of the building.  Lee Dep. 90:1-91:24; 111:10-115:4.  The parties never came to an agreement on the issue.  *Id.*  On November 6, 2015, Lee provided another draft of the lease amendment.  Document #15-14.

On November 17, Anthony was contacted by Maury Mitchell, LISA Academy's commercial real estate agent, regarding the building and Anthony instructed Shiu to follow up with Mitchell. Ex. YY.  Shiu reported that Mitchell had a charter school interested in the entire building.  *Id.*  Shiu told Mitchell that nothing had been executed yet with ITT and Anthony told Shiu to "push this". *Id.*  A meeting was set up by the end of the day for LISA officials to tour the ITT building.  *Id.*  On November 18, AP's real estate broker sent an email to the principal of LISA Academy asking whether it would be interested in leasing the space at 12200 Westhaven Drive because "ITT has been occupying the building [and] is downsizing."  Document #15-23 at 1.  On November 20, LISA Academy officials toured the building.  Document #15-24.  ITT assumed the tour was to show the other half of the building and find a complementary tenant.  Pilgreen Dep. 55:7-56:3.  Following the

---

[3] Exhibits filed under seal are identified on paper copies by letters of the alphabet and will be so identified here.

tour, Shiu emailed Mitchell and stated "that if LISA is interested in moving forward it is imperative that it be done quietly and as quickly as possible."  Document #15-24 at 2.

On November 20, Resa Gilmore, a Vice President at AP, sent Anthony an email stating: "ITT's deadline to give us notice if they want to exercise their option to renew is 12/2/15.  That is only 11 days away."[4]  Ex. AAA.  Anthony responded "Good."  *Id.*  On November 23 Lee sent an email to Shiu asking whether there were any updates.  Document #15-15 at 4.  Shiu responded and said that "travel and extremely complicated closings" had prevented AP from having time to dedicate to that property.  *Id.*  On November 30 Lee sent another email to Shiu asking whether there was anything he could do to speed along AP's review.  *Id.* at 3.

By December 1, AP had presented a letter of intent to LISA Academy for consideration.  Document #15-25.  The parties negotiated the terms and moved quickly due to the situation with ITT.  Document #15-26.

On December 4 and 7, Lee sent emails asking when he could call Shiu and Gilmore.  Document #15-16 at 1-2.  On December 7 Shiu responded and stated he was out of town and would be back in the office on December 9.  *Id.* at 1.  On December 10 Lee followed-up after not hearing from Shiu and Shiu said he was still trying to work on some language before calling.  Document #15-17 at 1.

On December 11, AP entered into a letter of intent with LISA Academy.  Document #15-28.  The letter stated: "This letter serves only to outline the basic terms from which a lease might be prepared.  Only a written lease executed by both parties will bind the Landlord and the Tenant.  No proposal, counter proposal, letter, or oral statement will be construed as binding on the Landlord."

---

[4] The lease provided that to exercise the option, ITT had to give AP notice "at least one hundred eighty (180) days before the Lease Term ends."  Document #15-1 at 32 ¶ 10.01(b)(ii).

*Id.* at 5.[5]  On December 14, AP submitted a redlined, edited version of a proposed lease agreement with LISA Academy to LISA Academy's attorney.  Document #15-29.

Also on December 14 Shiu sent Lee an email stating there was one section of the amendment that still troubled AP, i.e., the part dealing with "significant damage."  Document #15-18 at 5.  Prior to sending Lee the email, Shiu sent a draft version of the email to Gilmore and the original draft ended with a request to ITT to, "Please reconsider this issue and let us know your thoughts."  Ex. EEE.  That request was left out of the email sent to Lee.  Document #15-18 at 5.  Lee responded on December 18 with ITT's position on the exterior damage issue.  *Id.* at 4.

AP and LISA Academy entered into a Lease Agreement on December 18, 2015.  Document #15-30.  On the same day, LISA Academy's superintendent provided the Lease Agreement to the Executive Director of Arkansas Public School Resource Center and stated that AP wanted to keep the lease agreement quiet for seven days.  Document #15-31.

On December 22, Shiu forwarded Lee's December 18 email to Gilmore and asked, "Is anyone going to respond to this [or are] we just sitting on it?"  Ex. HHH.  She responded: "Jay asked this morning when we could tell them.  That would be Monday."  *Id.*  Lee followed-up on December 28 and January 5, 2016 and asked if they could agree to the exterior damage provision of 10%.  Ex. III at 1-2; Ex. JJJ at 1.  The December 28 email was forwarded to Shiu and Gilmore by Anthony and he stated, "Please do not respond until next week."  Ex. III.  On January 4, 2016 Shiu asked Anthony, "Is it time someone responds to ITT?"  *Id.*  Lee left a voicemail for Shiu on January 11, 2016.  Ex. KKK.

---

[5] The letter agreement between AP and ITT contained no such provision.

On January 11, 2016, LISA Academy informed AP that it had submitted its amendment application to expand its charter facility at 12200 Westhaven Drive.  Ex. LLL.  Later that day Anthony sent Lee an email that stated, "it looks as though we are not going to be able to agree to renewal terms.  Please plan to vacate the facility according to the terms of our existing lease." Document #15-18 at 1.

**B.    SUMMARY JUDGMENT STANDARD**

A court should grant summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The moving party bears the initial burden of demonstrating the absence of a genuine dispute for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  If the moving party meets that burden, the nonmoving party must come forward with specific facts that establish a genuine dispute of material fact.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).  A genuine dispute of material fact is presented only if the evidence is sufficient to allow a reasonable jury to return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  The court must view the evidence in the light most favorable to the nonmoving party and must give that party the benefit of all reasonable inferences that can be drawn from the record.  *Spencer v. Jackson Cnty. Mo.*, 738 F.3d 907, 911 (8th Cir. 2013).  If the nonmoving party fails to present evidence sufficient to establish an essential element of a claim on which that party bears the burden of proof, then the moving party is entitled to judgment as a matter of law.  *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015).

C.    **WHETHER THE MOTION FOR SUMMARY JUDGMENT IS PREMATURE**

ITT argues that the summary judgment motion is premature because discovery has not been completed.  Rule 56(b) provides that "a party may file a motion for summary judgment at any time until 30 days after the close of all discovery" unless the court provides otherwise.  Fed. R. Civ. P. 56(b).  "Although discovery need not be complete before a case is dismissed, summary judgment is proper only if the nonmovant has had adequate time for discovery."  *Robinson v. Terex Corp.*, 439 F.3d 465, 467 (8th Cir. 2006).

> The nonmoving party must make a showing, however, that discovery has been inadequate.  Rule 56(f) allows a party to request a delay in granting summary judgment if the party can make a good faith showing that postponement of the ruling would enable it to discover additional evidence which might rebut the movant's showing of the absence of genuine issue of material fact.

*Id.* (internal citations omitted).  ITT has made no showing that discovery is inadequate.  It should be noted that the parties were prepared to try the case on the merits in March.  The summary judgment motion is not premature.

D.    **STATUTE OF FRAUDS**

AP argues that summary judgment should be granted on Count I, the breach of contract claim, because the letter agreement does not comply with the statute of frauds.  Though AP does not explicitly assert that the letter agreement lacks the elements of a contract, some of its arguments suggest as much.

> The essential elements of a contract are (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligation.  This court cannot make a contract for the parties but can only construe and enforce the contract that they have made; if there is no meeting of the minds, there is no contract.  Moreover, the terms of a contract cannot be so vague as to be unenforceable.  The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and giving an appropriate remedy.

*City of Dardanelle v. City of Russellville*, 372 Ark. 486, 490-91, 277 S.W.3d 562, 565-66 (2008) (internal citations omitted).  A contract may be made through an exchange of letters, and reference to a future formal contract does not prevent the letters from creating a binding agreement.  *Skeen v. Ellis*, 105 Ark. 513, 152 S.W. 153, 154 (1912); *see also Little v. Miller*, 212 Ark. 356, 359-60, 205 S.W.2d 475, 476-77 (1947) ("Where a contract is actually entered into, whether by correspondence or by word of mouth, the agreement becomes effective at once, although it was expected that the terms of the contract would afterwards be reduced to writing and signed.").  All of the elements of a contract are present in the letter agreement.

The Arkansas statute of frauds states:

> Unless the agreement, promise, or contract, or some memorandum or note thereof, upon which an action is brought is made in writing and signed by the party to be charged therewith, or signed by some other person properly authorized by the person sought to be charged, no action shall be brought to charge any:
>
> \* \* \*
>
> (5) Person upon any lease of lands, tenements, or hereditaments for a longer term than one (1) year.

Ark. Code Ann. § 4-59-101(a)(5).  Thus, a contract to lease land for a period longer than one year falls within the statute of frauds and must be in writing.

AP contends that the letter agreement fails to satisfy the statute of frauds because it lacks a definite description of the real property to be leased.  The entire Westhaven property includes a building and 5.8735 acres.  The letter agreement did not provide for leasing the entire building, only a portion of it, i.e., 16,173 rentable and 15,073 usable square feet, and it did not mention the land outside the building.  Document #15-11.

An essential element of the written contract is a definite description of the land that is the subject matter of the agreement.  *Sossamon v. Davis*, 271 Ark. 156, 161, 607 S.W.2d 405, 409 (Ark.

App. 1980). Even if the parties definitely understood what property was to be conveyed, there must still be a writing with a definite description or the contract is unenforceable. *Routen v. Walthour-Flake Co.*, 221 Ark. 354, 357-58, 253 S.W.2d 208, 210 (1952). If a writing provides a key–a means by which the land can be identified–then "it need not describe the property with the particularity of a deed." *Price v. Willbanks*, 2009 Ark. App. 849, at 5, 374 S.W.3d 28, 32 (citing *Boensch v. Cornett*, 267 Ark. 671, 674, 590 S.W.2d 55, 57 (Ark. Ct. App. 1979)). Some language in the contract itself must furnish the key whereby the land can be definitely located and described. *Routen*, 221 Ark. at 356, 253 S.W.2d at 209. If the contract provides such a key, extrinsic evidence may be used to satisfy the statute of frauds. *Price*, 2009 Ark. App. at 5, 374 S.W.3d at 32. "Oral evidence may be resorted to only for the purpose of identifying the description contained in the writings but not for the purpose of locating the land and supplying the description which the parties have omitted from the writings." *Dev. & Constr. Mgmt., Inc. v. City of North Little Rock.*, 83 Ark. App. 165, 170, 119 S.W.3d 77, 81 (2003).

Here, the letter agreement provided the property's street address, 12200 Westhaven Drive, and stated that the lease was for 16,173 rentable and 15,073 usable square feet. Document #15-11 at 1 ¶¶ 1 and 3. "A designation of the premises in a contract or memorandum by street number ordinarily proves sufficient to satisfy the statute even though parol evidence must be resorted to in following the key furnished." *Creighton v. Huggins*, 227 Ark. 1096, 1101, 303 S.W.3d 893, 897 (1957). If the letter agreement had been to lease the entire Westhaven property, the description of 12200 Westhaven Drive undoubtedly would have been sufficient because the letter agreement incorporated the original lease by reference, and a legal description of the property at 12200 Westhaven Drive was an exhibit to the original lease. Document #15-1 at 38.

11

The letter agreement, however, provided for ITT to lease only a portion of the building, and it did not specify which portion.  Nevertheless, the letter agreement furnished a key by which the portion of the building to be rented could be definitely ascertained.  As noted, the letter agreement specified that ITT would lease 16,173 rentable and 15,073 usable square feet.  Document #15-11 at 1.  Those figures correspond exactly to the space plan sent by Lee to Shiu on August 13, 2015.  Document #11-20 at 2; Document #15-6.  AP internally referenced the August 13 space plan as the plan that the parties "agreed upon."  Ex. KK and  LL; Shiu Dep. 85:5-87:9 (explaining the context of Exs. KK and LL).  This August 13 space plan definitely described the portion of the building that was to be leased by AP to ITT.

Still, the property at 12200 Westhaven Drive covers more than the building; it also includes the outside acreage.  "[W]here only a smaller part of a larger tract is described, the description is insufficient to comply with the statute of frauds as to a description of the entire tract."  *Dev. & Constr. Mgmt, Inc.*, 83 Ark. App. at 172, 119 S.W.3d at 82.  The lease included not only the entire building but also all of the approximately 5.8735 acre site on which the building sat.  Document #15-1 at 6 ¶ 1.02.  It also stated that ITT would have exclusive use of no less than 256 parking spaces.  *Id.* at 11 ¶ 1.06.  AP argues that the letter agreement fails to describe any portion of the tract outside the building that would be covered by the new lease.  In response, ITT argues that because the letter agreement stated all unmodified terms would remain as those in the lease, the requirement of the statute of frauds are met because the letter agreement incorporates by reference ITT's right to 256 parking spaces as stated in the lease.  That argument prevails.

AP has presented no authority for the proposition that a written lease for a portion of a commercial building with a provision for a specified number of on-site parking spaces must include

a legal description of the parking spaces to which the tenant is entitled in order to comply with the statute of frauds.  AP's motion for summary judgment based on the statute of frauds is denied.

E.    **PROMISSORY ESTOPPEL**

AP next argues that ITT's promissory estoppel claim fails as a matter of law.  The elements of its claim of promissory estoppel are: (1) the defendant made a promise; (2) the defendant should have reasonably expected the plaintiff to act or refrain from acting in reliance on the promise; (3) the plaintiff acted or refrained from acting in reasonable reliance on the promise to its detriment; and (4) injustice would result from refusal to enforce the promise.  *Fairpark, LLC v. Healthcare Essentials, Inc.*, 2011 Ark. App. 146, at 12, 381 S.W.3d 852, 859; Arkansas Model Jury Instructions–Civil 2444 (2016).  "The general rule is that claims of promissory estoppel are questions for the fact finder."  *Taylor v. Eagle Ridge Developers, LLC*, 71 Ark. App. 309, 313, 29 S.W.3d 767, 769 (2000).  "Whether there was actual reliance . . . and whether it was reasonable is also a question for the trier of fact."  *Id.* at 313, 29 S.W.3d at 770.

AP argues that the letter agreement did not constitute a promise but only a manifestation of intent to negotiate further, and that ITT, as a sophisticated entity, could not reasonably rely upon the letter agreement because it did not satisfy the statute of frauds.  The Court has already held that the letter agreement contains all the essential elements of a contract, so it did include a promise.[6] Likewise, the Court has already held that the letter agreement complied with the statute of frauds, so ITT could reasonably rely upon it.

---

[6] Promissory estoppel is a basis for recovery when the elements of a contract are not present. *Superior Fed. Bank v. Mackey*, 84 Ark. App. 1, 27, 129 S.W.3d 324, 341 (2003).  While a party may not recover for the same loss for both breach of contract and promissory estoppel, the two theories may be pursued in the alternative.  *See id.*  In any event, AP has not argued that ITT is precluded from pursuing a promissory estoppel claim in the alternative to its breach of contract claim.

AP also argues that ITT's ability to lease space in Kirkpatrick Plaza defeats any claim that ITT has been injured or suffered any form of detriment.  AP notes that the rent at Kirkpatrick Plaza is lower than the rent at 12200 Westhaven Drive and that ITT does not have to design and complete construction as it would have had to do at 12200 Westhaven Drive.  Therefore, AP contends, ITT is actually in a better position than it would have been had the parties consummated the lease amendment for 12200 Westhaven Drive.  This argument is unpersuasive.  Although ITT may be paying lower rent and may not have to do construction, ITT may have incurred damages from relocation costs, moving expenses, and expenses from ensuring that the new building fits ITT's needs.  Whether ITT has been damaged is a question for the jury.

## F.   AGREEMENT TO NEGOTIATE IN GOOD FAITH

AP next contends that Count IV–"breach of agreement to negotiate in good faith"–is not recognized as a cause of action in Arkansas.  If ITT is alleging that AP failed to execute the lease amendment as agreed, that allegation is part of the breach of contract claim.  If ITT is alleging that AP violated an implied duty to negotiate in good faith, such a cause of action does not exist under Arkansas law.  *Country Corner Food and Drug, Inc. v. First State Bank and Trust Co. Of Conway, Arkansas*, 332 Ark. 645, 655, 966 S.W.2d 894, 899 (1998) ("The fact that every contract imposes an obligation to act in good faith does not create a cause of action for a violation of that obligation, and . . . this court has never recognized a cause of action for failure to act in good faith.").  Count IV is dismissed.

## G.   TOUR OF THE BUILDING

The next issue is whether AP is entitled to judgment as a matter of law on ITT's claim that it breached the lease by giving a tour of the building to representatives of LISA Academy.  AP

argues that its entry into the building at 12200 Westhaven Drive without notice did not violate any provision of the lease because there was no provision explicitly forbidding AP from entering without notice.  AP points out that the lease expressly permitted AP to enter the property for certain listed reasons, but it did not expressly forbid entry for other reasons.  AP argues that it could enter for other reasons so long as the entry did not "materially and substantially interefere[] with the conduct of Tenant's business."  Document #15-1 at 30 ¶ 9.03(c).  And even if it did violate the lease, AP argues this was not a material breach.  In contrast, ITT argues that the only time AP had the right to show prospective tenants the building without prior notice was in the last six months of the lease term.  Document #15-1 at 30 ¶ 9.03(a).  ITT argues this was a material breach because it led to AP entering into a competing lease with LISA Academy that ultimately led to an anticipatory repudiation of the Proposal.

The lease provided that "[a]t any reasonable time during the last six (6) months of the Lease term, Landlord . . . shall have the right to enter the Leased Premises during Tenant's business hours, without notice to Tenant, for the purpose of showing the Leased Premises."  Document #15-1 at 30 ¶ 9.03(a).  The lease also provided that the Landlord had the right to enter during reasonable hours with reasonable prior notice for the following reasons: "(i) inspection, cleaning, or making repairs; (ii) making such alterations or additions as Landlord may deem necessary or desirable; (iii) installation of utility lines servicing the Leased Premises; (iv) determining Tenant's use of the Leased Premises; or (v) determining if a Tenant Default has occurred."  *Id.*  The lease then stated: "Notwithstanding anything to the contrary in Subsections 9.03(a) and (b) above if Landlord's entry materially and substantially interferes with the conduct of Tenant's business . . . the Base Rent will abate in proportion to the extent of the interference."  *Id.* at 30 ¶ 9.03(c).  AP argues that this

provision means that it could enter provided it did not materially and substantially interfere with ITT's business, but the plain meaning of the lease does not support that interpretation. Instead, this provision means that if AP entered for one of the permitted reasons but interfered materially and substantially with ITT's business, then the rent would be abated, even though the entry was permitted.

Nevertheless, AP's motion on this claim will be granted because ITT has presented no evidence that damages resulted from this breach. "A person may be liable for breach of contract if the complaining party can prove the existence of an agreement, breach of the agreement, and resulting damages." *Foreman School Dist. No. 25 v. Steele*, 347 Ark. 193, 202, 61 S.W.3d 801, 807 (2001) (citing *Ultracuts Ltd. v. Wal-Mart Stores, Inc.*, 343 Ark. 224, 231-32, 33 S.W.3d 128 (2000)). "[T]o be recoverable, damages must have been, in a legal sense, caused by the wrongful act; typically, more certainty is required for a contract claim than for a tort claim." *Spann v. Lovett & Co., Ltd.*, 2012 Ark. App. 107, at 17, 389 S.W.3d 77, 91 (citing Howard W. Brill, <u>Arkansas Law of Damages</u> § 4.5 (5th ed. 2004)). "In general, damages recoverable for breach of contract are those damages that would place the injured party in the same position as if the contract had not been breached . . . . Damages must arise from the wrongful acts of the breaching party." *Id.* ITT argues that its damages are the costs of finding a new building due to AP's anticipatory repudiation of the letter agreement, but those damages did not flow from breach of the lease; they are due to the breach of the letter agreement. ITT has presented no evidence that damages resulted from this breach, so it has failed to present evidence on an essential element of this claim. Count V is dismissed.

H.      DAMAGES

AP next contends that even if the letter agreement is enforceable, ITT's damages are limited to general and nominal damages because Arkansas follows the tacit agreement rule. The issue hinges on whether ITT's claim is that AP unlawfully evicted ITT or that AP failed to deliver possession of the premises. Arkansas "is committed to the rule that the measure of damages in an action by lessee against a lessor for failure to deliver possession of leased premises is the difference between the rent reserved and the value of the premises of the term." *Morrison v. Weinstein*, 151 Ark. 255, 261, 236 S.W. 585, 586 (1921). "While ordinary or general damages follow as a matter of course for a breach of the covenant or contract for possession of leased premises, special damages do not. Special damages are allowable only in case they were in contemplation of the parties at the time of the execution of the lease in the event a breach of the covenant for possession should occur." *Id*. But, "[w]here a tenant is unlawfully evicted, the tenant is entitled to recover as damages whatever loss results to him because of the wrongful act." *Burdan v. Walton*, 286 Ark. 98, 101, 689 S.W.2d 543, 545 (1985). In this context, "[e]viction means interfering with the tenant's enjoyment of the premises." *Id*., 286 Ark. at 100, 689 S.W.2d at 545.

ITT was in possession of the premises and had been for approximately five years. The letter agreement provided for an amendment to the lease, not a new lease. Consequently, ITT's claim is that it was wrongfully evicted, not that AP failed to deliver possession of the premises. Therefore, AP "is entitled to recover as damages whatever loss results to [it] because of the wrongful act." *Id*., 286 Ark. at 101, 689 S.W.2d at 545. AP's motion for summary judgment on this issue is denied.

## II.  LEAVE TO FILE A SECOND AMENDED COMPLAINT

As noted above, ITT has moved for leave to file a second amended complaint.  The proposed second amended complaint omits the claims for equitable relief and restates the claim for breach of contract based on the contention that the letter agreement is an enforceable contract, the claim that ITT breached the contract when it gave a tour to representatives of LISA Academy, the claim that ITT breached an agreement to negotiate in good faith, and the promissory estoppel claim.  It also adds a claim for fraud.  AP opposes the motion for leave to amend, arguing that permitting the amendment would be futile because the only new claim, i.e., the fraud claim, is inconsistent with the undisputed facts.

### A.    STANDARD FOR A MOTION FOR LEAVE TO AMEND

Federal Rule of Civil Procedure 15(a)(2) provides that a court should give leave to amend freely when justice so requires.  Leave to amend need not be given, however, if the amendment would be futile.  *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962).  Normally, saying that the amendment would be futile "means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure."  *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008).  Here, however, AP argues, based on the factual record that exists as a result of the motion for summary judgment and prior motions, that ITT's proposed fraud claim–which is the only new claim in the proposed second amended complaint–could not survive a motion for summary judgment under Rule 56.  Both parties have briefed the futility issue as though it is governed by Rule 56 standards, so the Court will address it under those standards.[7]

_____

[7] *Cf. Robertson v. White*, 111 F.R.D. 607, 612 (W.D. Ark. 1986) ("For obvious reasons, courts have not undertaken a Rule 56 assessment of a proposed amendment although under a futility

18

**B.      THE FRAUD CLAIM**

The proposed fraud claim is based on statements made by representatives of AP between November 16, 2015, and January 11, 2016, to the effect that AP's representatives were too busy to focus on the draft of the leased amendment and that the exterior damage provision was a material term that prevented AP from being able to execute the formal lease.  At this time, ITT was pressing AP to conclude the negotiations regarding the formal lease amendment.

The proposed second amended complaint assumes that the deadline for ITT to exercise its option to extend the lease for the entire building was November 27, 2015.  Document #36-1 at 21 ¶ 99.  The parties have briefed the futility issue on the assumption that ITT's renewal option had to be exercised by November 27, 2015.  As noted above, AP's internal correspondence calculated the deadline to be December 2, 2015.  *See* Ex. AAA.  The December 2 calculation appears to be more accurate, but nothing hinges on that five-day difference.

On November 17, 2015, LISA Academy's real estate agent approached AP regarding leasing the entire building, and Anthony instructed Shiu to "push this."  Ex. YY.  A jury reasonably could conclude from the evidence that from that date forward AP made it a priority to consummate a lease agreement with LISA Academy while holding ITT at bay until the agreement with LISA Academy could be concluded.  AP and LISA Academy entered into a lease agreement on December 18, 2015. Document #15-30.  That lease agreement became public on January 11, 2016, when LISA Academy submitted its charter amendment application to the Arkansas Department of Education, asking to open an elementary campus at 12200 Westhaven Drive.  Document #15-32.  Later that day, Anthony

---

analysis nothing could be more feckless than to permit an action to go to trial which discovery has shown to be virtually denuded of factual support.").

sent an email to Lee saying, "it looks as though we are not going to be able to agree to renewal terms.  Please plan to vacate the facility according to our existing lease."  Document #15-18 at 1.

ITT's theory is that AP lied concerning the reasons that it was not moving forward to conclude the lease amendment (1) to prevent ITT from exercising the option to renew the entire lease by the deadline of November 27, 2015, and (2) to keep ITT from looking for alternative space thereafter while the lease with LISA Academy was being consummated.

AP points out that ITT alleges only one fraudulent communication before November 27, 2015.  On November 23, 2015, Lee sent an email to Shiu asking if there were any updates, and Shiu responded to Lee's inquiry as to whether there were any updates with the following message: "Between travel and extremely complicated closings, Resa and I have not had time to dedicate to this.  Will do our best to get back to you ASAP.  Thanks."  Document #15-15 at 4.  AP argues that this statement was true, citing Shiu's calendar, which shows that from November 23 to November 25 of 2015 Shiu was in Allentown, Pennsylvania.  That argument misses the point of ITT's fraud theory.  ITT does not contend that Shiu was not traveling and was not involved in complicated closings; rather, ITT contends that, in the context, Shiu's statement indicated that AP had not acted on the lease amendment because Shiu was too busy, which was a lie: AP had not acted on the lease amendment because it was intending to lease the property to LISA Academy.

In addition to this allegedly false statement of material fact, ITT argues that AP, in the circumstances of this case, had a duty to disclose AP's negotiations with LISA Academy.  In support of that argument, ITT cites *Holiday Inn Franchising, Inc. v. Hotel Assocs., Inc.*, 2011 Ark. App. 147, 382 S.W.3d 6.  There, a hotel franchisee recovered compensatory and punitive damages against the franchisor for fraud.  At the franchisor's request, the franchisee purchased a hotel and converted it

into one of its franchises.  When the franchisee agreed to purchase the hotel, it asked for a licensing

agreement of fifteen to twenty years, but the franchisor only agreed to a ten-year license, stating

"there was no reason to think that [the franchisee] would not receive a license extension at the end

of the ten years."  *Id*. at 3, 382 S.W.3d at 10.  During the initial ten-year franchise license, however,

the franchisor developed a business plan to license the same building with a competitor after the ten-

year period ended.  *Id*. at 4, 382 S.W.3d at 10.  The franchisor never disclosed this business plan.

One of the issues on appeal was whether the franchisor had a duty to disclose this business plan.

Holding that the franchisor had a duty to disclose, the court of appeals explained:

> Generally, a mere failure to volunteer information does not constitute fraud. *Farm Bureau Policy Holders v. Farm Bureau Mut. Ins. Co.*, 335 Ark. 285, 302, 984 S.W.2d 6, 14-15 (1998). But silence can amount to actionable fraud in some circumstances where the parties have a relation of trust or confidence, where there is inequality of condition and knowledge, or where there are other attendant circumstances. *Id*. The duty to disclose is not limited to confidential or fiduciary relationships, as Holiday Inn suggests. *See Camp v. First Fed. Savings & Loan*, 12 Ark. App. 150, 154, 671 S.W.2d 213, 216 (1984). There may be a special relationship or special circumstances requiring disclosure. *Id*. In determining whether such special relationships or circumstances exist, the events surrounding the parties' transaction may be considered. *Lambert v. Firstar Bank*, 83 Ark. App. 259, 265, 127 S.W.3d 523, 527-28 (2003).
>
> In this case, substantial evidence supports the existence of a duty on Holiday Inn's part to disclose the Aden report to HAI. Buddy House had a long-term relationship with Holiday Inn characterized by honesty, trust, and the free flow of pertinent information. He testified that Bill Bradford's assurances at the onset of licensure in 1995 led him to believe that he would be relicensed after ten years if the hotel was operated appropriately. Yet, despite Holiday Inn's having provided such an assurance to House, it failed to apprise House of an internal business plan, developed only four years into his licensing period, that advocated licensure of another facility instead of the renewal of his license. A duty of disclosure may exist where information is peculiarly within the knowledge of one party and is of such a nature that the other party is justified in assuming its nonexistence. *Bridges v. United Savings Ass'n*, 246 Ark. 221, 228, 438 S.W.2d 303, 306 (1969); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. First Nat'l Bank of Little Rock*, 774 F.2d 909, 913-14 (8th Cir.1985). Given House's history with Holiday Inn and the assurance he

> received from Bradford, we are convinced he was justified in assuming that no
> obstacles had arisen that jeopardized his relicensure.

*Id*. at 12-13, 382 S.W.3d at 14.  Here, in addition to their five-year relationship as landlord and

tenant, AP and ITT had executed a letter agreement to extend the lease for another five years subject

to a mutually agreeable lease amendment.  Document #15-11 at 1.  As a part of that letter agreement,

the parties agreed "Landlord and Tenant shall execute a mutually acceptable amendment to the

Lease, based on Tenant's Lease amendment form."  *Id*. at 2 ¶ 11.  ITT was entitled to rely on this

manifestation of intent by AP to execute a lease amendment.  By November 17, 2015, however,

instead of going forward with the lease amendment pursuant to the letter agreement with ITT, AP

was attempting to lease the entire building to LISA Academy.  That AP was pursuing this alternative

was information that was peculiarly within the knowledge of AP and was of such a nature, under

the circumstances, that ITT was justified in assuming its nonexistence.  Therefore, AP had a duty

to disclose to ITT that it was negotiating to lease the entire building at 12200 Westhaven Drive to

LISA Academy.

AP also argues that ITT did not rely on Shiu's statements because it never intended to

exercise its option to renew the lease for the entire building.  While there is evidence to support that

argument, there is also contrary evidence.  Lee has testified by affidavit that says that if ITT had

known that AP was negotiating with LISA Academy to lease the entire building "ITT would have

likely exercised its option under ITT's and AP's lease agreement dated October 28, 2010 . . . to

renew the 2010 lease for the entire property by November 27, 2015, rather than be left in the

situation in which ITT was ultimately placed when it learned of LISA Academy's lease with AP in

January 2016."  Ex. OOO.  Whether this testimony is credible is for the jury, not for the Court in

ruling on summary judgment.

AP also argues that ITT's fraud claim must fail because ITT cannot prove damages inasmuch as ITT has secured a space for less rent than it would have been paying had it exercised its option to renew the lease for the entire building at 12200 Westhaven Drive.  That argument ignores the possibility that ITT might have subleased the portion of the building that it did not need.  The original lease provided that ITT could not sublease all or part of the building without AP's written consent, "which consent shall not be unreasonably withheld or delayed by Landlord."  Document #15-1 at 18.  While the evidence may ultimately show that ITT was not damaged by its alleged fraud, the Court cannot say that AP has met its burden of establishing, as a matter of law, that ITT suffered no damage.

## C.   JURY TRIAL

ITT's proposed second amended complaint demands a trial by jury.  AP argues that ITT has waived its right to a jury trial by not requesting one before the proposed second amended complaint.

A party must make a demand for a jury trial no later than fourteen days after the last pleading directed to the issue is served.  Fed. R. Civ. P. 38(b)(1).  "A party waives a jury trial unless its demand is properly served and filed."  Fed. R. Civ. P. 38(d).  Once the right is waived, it may be revived only where new issues are raised and only as to those new issues.  *In re Yukon Energy Corp.*, 138 F.3d 1254, 1260 (8th Cir. 1998).  If the essence of an allegation does not change, then the right to a jury trial is not revived.  New issues are raised where the amended complaint substantially differs from prior pleadings by, for example, adding a new cause of action based on new facts.  *First Wisconsin Nat'l Bank of Rice Lake v. Klapmeier*, 526 F.2d 77, 80 (8th Cir. 1975).

Here, the proposed second amended complaint presents a new claim, i.e., fraud, based on facts that were not previously alleged.  Therefore, ITT has a right to a trial by jury as to the fraud claim.

While ITT does not have a right to a trial by jury on the contract claims and promissory estoppel, "the court may, on motion, order a jury trial on any issue for which a jury might have been demanded."  Fed. R. Civ. P. 39(b).  Under Rule 39(b), jury trials should be liberally granted when no prejudice will result.  *Littlefield v. Fort Dodge Messenger*, 614 F.2d 581, 585 (8th Cir. 1980).

AP has not demonstrated that it will suffer prejudice by allowing a jury trial on all issues.  Indeed, since ITT is entitled to a jury trial on the fraud claim, it only makes sense to allow the jury to decide the other claims as well.  ITT's request for a jury trial on all claims will be granted.

## CONCLUSION

For the reasons stated, AP's motion for summary judgment is granted as to Count IV and Count V but otherwise denied.  Document #29.  ITT's motion for leave to file a second amended complaint is granted in part and denied in part.  Document #36.  ITT will be permitted to file a second amended complaint.  Because the Court has granted summary judgment on ITT's claim for breach of an agreement to negotiate in good faith and that AP breached the 2010 lease by giving a tour of the building to LISA Academy representatives, those claims must be deleted, and then the second amended complaint may be filed.

IT IS SO ORDERED this 19th day of July, 2016.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE